UNITED STATES BANKRUPTCY COURT
MIDDLE DISTRICT OF FLORIDA
ORLANDO DIVISION

| | | |
|---|---|---|
| In re | ) | |
| | ) | |
| THAKURDIAL R. RAMSURAT, | ) | Case No.  6:05-bk-17049-KSJ |
| | ) | Chapter 7 |
| Debtor. | ) | |
| | ) | |
| ―――――――――――――― | ) | |
| | ) | |
| KENNETH D. HERRON, JR., Trustee, | ) | |
| | ) | |
| Plaintiff, | ) | Adversary No. 6:06-ap-50 |
| vs. | ) | |
| | ) | |
| BHOOPMANIE SINGH, | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

<u>MEMORANDUM OPINION</u>

In this adversary proceeding, the plaintiff is the Chapter 7 Trustee, Kenneth D. Herron, Jr.  He is seeking to avoid a transfer made by the debtor, Thakurdial R. Ramsurat, to his wife, the defendant, Bhoopmanie Singh.  The contested transfer involves a residential home initially titled jointly in the name of the debtor and his wife and later transferred by the debtor to his wife in two deeds—one given on June 9, 2003, and the second deed executed on July 25, 2005.  Due to financial problems with his business, the debtor filed this Chapter 7 bankruptcy case on October 16, 2005, shortly after the second deed was executed.

Very few facts are in dispute.  On May 22, 1998, Newton Holtzclaw and Mary E. Holtzclaw, as husband and wife, executed and delivered a Warranty Deed (the "Original Warranty Deed") to "Ramsurat Thakurdial and Bhoopmanie Singh," conveying a single-family home located at 126 N. Observatory Drive, Orlando, FL  32835, and legally described as:

> Lot 27 and the North One-Half of lot 28, block N, ORLO VISTA
> HEIGHTS ADDITION, according to the plat thereof recorded in

> plat book L, Page 75, of the public records of Orange County,
> Florida (the "Observatory Home") (Defendant's Ex. No. 7).

A few days later, on June 15, 1998, the debtor married Ms. Singh, the defendant. (Plaintiff's Ex.

No. 2).

On June 19, 1998, soon after the debtor's wedding, a revised warranty deed transferring

the Observatory Home was recorded in the Public Records of Orange County, Florida, at OR

Book 5507, Page 4776 (the "1998 Revised Recorded Deed") (Plaintiff's Exh. No. 1).  The 1998

Revised Recorded Deed contained *two* differences from the Original Warranty Deed.  First, the

1998 Revised Recorded Deed listed the debtor and the defendant as "Husband and Wife."

Second, the 1998 Revised Recorded Deed also modified the legal description as follows:

> Lot 27, and lot 28, block N, ORLO VISTA HEIGHTS
> ADDITION, according to the plat thereof recorded in plat book L,
> Page 75, of the public records of Orange County, Florida
> ("Property").

The deed correctly transferred <u>all</u> of Lot 28, not just the north one-half of Lot 28, as was

reflected in the earlier deed of May 22, 1998.

Based on a review of the 1998 Revised Recorded Deed, the Court would find that the

parties did not execute a new deed.  Rather, the Original Warranty Deed was modified and

initialed by the selling parties, Mr. and Mrs. Holtzclaw.  The words "HUSBAND AND WIFE"

were typed onto the revised deed.  The legal description was modified to cross out the notation

"NORTH ONE-HALF" of Lot 28.  As modified, the 1998 Revised Recorded Deed then was

filed in the public records of Orange County, Florida.

The defendant's parents, who were elderly and moving to the United States, were the

intended residents of the Observatory Home.  They moved into the home shortly after its

purchase.  The debtor never lived in the home. The defendant's parents, perhaps with assistance

from other family members, made substantial improvements to the Observatory Home.  They

added a room and made other alterations.  They, with the help of the defendant's sister, paid all the real estate taxes, insurance, and maintenance costs related to the Observatory Home.

The debtor, however, did assist in gathering the funds needed to buy the Observatory Home.  The purchase price was $77,000.  The debtor and his soon-to-be-wife, the defendant, contributed $35,000 to the purchase price.  They obtained these funds by taking out a separate, second mortgage on their home located on Killary Court in Orlando.  The defendant signed two checks, both written on her sister's bank account, each in the amount of $456.74, for the mortgage payments due in July and August, 1998. (Defendant's Ex. No. 10).  The Court could not ascertain who provided the funds to make these two payments.  However, the defendant's sister, Bhoopwattie Balgobin, clearly provided the funds to pay off the debtor's second mortgage.  Ms. Balgobin wrote a check to the mortgage holder, First Union Bank, in the amount of $35,833.32 on September 1, 1998.  (Defendant's Ex. No. 11).

As such, although the debtor did contribute $35,000 to the initial purchase price of the Observatory Home, he never paid any portion of the mortgage and the loan was repaid within four months on September 1, 1998.  After the repayment of this mortgage, neither the debtor nor the defendant made any further financial contribution to the Observatory Home.  Rather, the defendant's family, her sister, brother, and parents, paid the balance of the purchase price and paid all other costs associated with the improvements, maintenance and care of the Observatory Home.

As the years passed, the debtor's business encountered financial difficulties. He was unable to pay the operating expenses.  Creditors were not being paid on a timely basis, and they were suing him for monies due and owing. At this point, the defendant, who was concerned that her husband's creditors would try to obtain title to the Observatory Home property, demanded that the debtor transfer his interest in the house to her.  The debtor complied.  On June 9, 2003, the debtor and defendant, as husband and wife, executed and delivered a Quit Claim Deed to the

defendant, conveying to her all of their interests in the Observatory Home. (Plaintiff's Ex. No. 4). The deed was recorded that same day in Orange County, in Book 06945, at page 3638. The parties intended to convey their entire interest to the defendant alone in this deed; however, the deed contained an incorrect legal description. The Quit Claim Deed, as executed, only conveyed the "North One-Half of Lot 28", not the entire lot.

On the same day the debtor transferred his interest in the Observatory Home, June 9, 2003, a Stipulated Final Judgment was entered against him and in favor of United Financial Group, Inc. in the amount of $180,140.66. (Plaintiff's Ex. No. 3.) Other judgments were later entered against the debtor, including:

> Final Summary Judgment in favor of General Electric Capital Corporation against Thakurdial Ramsurat dated May 18, 2004, in the amount of $103,747.21. (Plaintiff's Ex. No. 4).
>
> Summary Final Judgment in favor of Huntington National Bank and against Get Tours and Thakurdial Ramsurat dated January 14, 2005, in the amount of $19,282.55. (Plaintiff's Ex. No. 5).

Neither the defendant nor her husband share any joint creditors, with the exception of a mortgage on their homestead. The defendant and the debtor always have maintained separate credit, bank, and business accounts. The debtor has no knowledge of his wife's finances or of her family's financial condition.

At the same time that the debtor's business was declining, the defendant's parents were encountering more serious health problems and needed to move even closer to their daughter so she could help with their daily needs. The defendant and her sister found a closer, suitable home for their parents and, sometime prior to May 2005, the defendant and her sister purchased another single-family home, financed by a purchase money mortgage, for their parents. This new home was titled in the name of the defendant and her sister.

When their parents were settled in the new home, the defendant sold the Observatory Home. On July 25, 2005, the defendant executed and delivered a Warranty Deed conveying the

Property to Kaveita Kanhai, who is a disinterested third party and not connected to the parties in any way. (Plaintiff's Ex. No. 8).[1] The purchase price of the new home was $190,000.00. After paying costs of sale and reimbursing her sister for repairs and improvements made on the Observatory Home, the defendant received approximately $75,000, which she invested in the new home where her parents lived. She used these funds to pay down the mortgage encumbering the property.

In order to allow the Observatory Home to be sold, however, the debtor was required to sign a Corrective Quitclaim Deed to fix the error in the legal description made on both the Original Deed and subsequently repeated in the Quit Claim Deed, dated June 9, 2003. The defendant and debtor, as husband and wife, executed and delivered a Corrective Quit Claim Deed on July 25, 2005, which provided that:

> This deed is being recorded to correct that certain quit-claim deed recorded June 9, 2003 in Official Records Book 6945, page 3638, Public Records of Orange County, Florida, *to correct the legal description* and to add a non-homestead clause.

(Plaintiff's Ex. No. 7) (*emphasis added*). The only portion of the Property conveyed by this Corrective Quit Claim Deed, and not included in the 2003 Quit Claim Deed, was a small portion of the property—the South One-Half of Lot 28. The Court would find that the parties intended to convey their entire interest in the Observatory Home in 2003, but that they failed simply because they repeated the earlier mistake contained in the Original Warranty Deed.

Shortly thereafter, on October 16, 2005, the debtor filed this Chapter 7 bankruptcy case. His appointed trustee has filed this adversary proceeding seeking to avoid the transfer of his interest in the Observatory Home to his wife on June 9, 2003, in accordance with Section 548

---

[1] The Court finds that Ms. Kanhai is a good-faith purchaser for value.

and 544 of the Bankruptcy Code[2] and Chapter 726, Florida Statutes. The trustee alleges both constructive and actual fraud, seeks to recover money damages in proportion to the debtor's former interest in the Observatory Home, and, lastly, seeks a determination of the debtor's interest in the Observatory Home, if the transfer is avoided.

The defendant denies that the transfer is avoidable and raises two affirmative defenses. First, the defendant asserts that the debtor never had any equitable interest in the home, only a bare legal interest arising from her decision to place his name on the title to the property. Second, and alternatively, to the extent the debtor is found to have some interest in the Observatory Home, the defendant asserts that she and the debtor owned the property as tenants by the entireties and, as such, it is not subject to claims of creditors or avoidance by the trustee.

As a threshold matter, the Court rejects the defendant's argument that the debtor had no cognizable interest in the Observatory Home. The couple purchased the home together using funds they obtained by taking out a second mortgage on their Killary Court home. Both of their names appeared on the various Observatory Home deeds until they executed the deed on June 9, 2003, transferring the jointly-owned property into the wife's/defendant's name alone. Although the defendant's family certainly contributed substantially to the purchase price, maintenance, and improvements to the Observatory Home, the Court specifically finds that the home was exclusively owned by the debtor and the defendant in equal shares; i.e., they each had a 50 percent ownership interest in the home. The most logical conclusion is that the defendant's family intended to give the Observatory Home to the defendant and her soon-to-be husband, the debtor, as a gift and to allow them to realize the value of the home after the defendant's parents no longer lived at the house. Hence, the debtor had a sufficient interest in the Observatory Home to allow the trustee to seek avoidance of the transfer. Of course, the trustee first must

---

[2] Unless otherwise stated, all references to the Bankruptcy Code refer to Title 11 of the United States Code.

demonstrate that the transfer was actually or constructively fraudulent as to the debtor's creditors.

Whether the debtor's pre-petition transfer of his interest in the Observatory Home to his wife amounts to actual or constructive fraud is determined by Bankruptcy Code Sections 544 and 548 and Florida Statute Section 726.105. The plaintiff carries the burden of proving that the debtor's transfer was fraudulent under both the federal and state statutes. In re Vurchio, 107 B.R. 363, 364 (Bankr.M.D.Fla.1989) (trustee carries the burden under Bankruptcy Code Section 548); In re PSI Industries, Inc., 306 B.R. 377, 387 (Bankr.S.D.Fla.2003) (creditor/trustee carries the burden under Florida law).

Section 548 of the Bankruptcy Code limits avoidable transfers to those made "within one year before the date of the filing of the petition."  Given that the debtor filed his bankruptcy petition on October 16, 2005, the applicable reach back period is extended to October 17, 2004. Here, the trustee cannot prevail under Section 548 because the debtor transferred his interest in the Observatory Home to his wife on June 9, 2003, over two years prior to filing this bankruptcy petition. No avoidable transfer of the debtor's interest occurred when the parties executed the Corrective Quit Claim Deed on July 25, 2005, approximately three months before the debtor filed this bankruptcy case; rather, that Corrective Deed was executed merely to rectify a scrivener's error in the legal description. The parties intended to, and, despite repeating the mistake in the legal description, did effectively convey the debtor's interest in the Observatory Home when they executed the deed on June 9, 2003.  Therefore, no transfer of an interest of the debtor in the Observatory Home was made within one year before the date of the filing of the petition.  The transfer is not avoidable under Section 548 of the Bankruptcy Code.

Next, turning to the relevant Florida state statute, the trustee argues that the transfer of the debtor's interest in the Observatory Home is avoidable pursuant to Florida's version of the Uniform Fraudulent Transfer Act, specifically, Florida Statute Sections 726.105(1)(a) and (1)(b),

via the strong arm powers supplied by Bankruptcy Code Section 544.[3]  Florida Statute Section

726.105 provides in relevant part as follows:

> (1)      A transfer made or obligation incurred by a debtor is fraudulent as to a
> creditor, whether the creditor's claim arose before or after the transfer was
> made or the obligation was incurred, if the debtor made the transfer or
> incurred the obligation:
>
>> (a)      With actual intent to hinder, delay, or defraud any creditor of the
>> debtor; or
>>
>> (b)      Without receiving a reasonably equivalent value in exchange for
>> the transfer or obligation, and the debtor:
>>
>>> 1.      Was engaged or was about to engage in a business or a
>>> transaction for which the remaining assets of the debtor
>>> were unreasonably small in relation to the business or
>>> transaction; or
>>>
>>> 2.      Intended to incur, or believed or reasonably should have
>>> believed that he or she would incur, debts beyond his or her
>>> ability to pay as they became due.

---

[3] Bankruptcy Code Section 544 empowers a trustee to avoid any transfer of property of the
debtor that is voidable by:

**(1)** a creditor that extends credit to the debtor at the time of the commencement of
the case, and that obtains, at such time and with respect to such credit, a judicial
lien on all property on which a creditor on a simple contract could have obtained
such a judicial lien, whether or not such a creditor exists;

**(2)** a creditor that extends credit to the debtor at the time of the commencement of
the case, and obtains, at such time and with respect to such credit, an execution
against the debtor that is returned unsatisfied at such time, whether or not such a
creditor exists; or

**(3)** a bona fide purchaser of real property, other than fixtures, from the debtor,
against whom applicable law permits such transfer to be perfected, that obtains
the status of a bona fide purchaser and has perfected such transfer at the time of
the commencement of the case, whether or not such a purchaser exists.

The defendant does not contest the trustee's standing under Section 544 of the Bankruptcy
Code to assert the state law fraudulent transfer claim.

Florida Statute Section 726.110 provides, relevantly, that causes of action may be brought under Sections 726.105(1)(a) and (b) within four years after the transfer was made or, if later, within one year after the transfer could reasonably have been discovered by the claimant. Here, the transfer was made on June 9, 2003, and this adversary proceeding was filed on January 31, 2006, less than four years after the transfer was made. Accordingly, the trustee can avoid the conveyance if he can prove it was fraudulent.

To avoid a transfer due to <u>actual</u> fraud under Florida law, the trustee "must demonstrate that there was (i) a creditor to be defrauded; (ii) a debtor intending fraud; and (iii) conveyance of property that could have been applicable to payment of the debt due." <u>In re PSI Industries, Inc.</u>, 306 B.R. 377, 387 (Bankr.S.D.Fla.2003) (<u>citing</u> <u>Huntsman Packaging Corp. v. Kerry Packaging Corp.</u>, 992 F. Supp. 1439 (M.D.Fla.1998); <u>In re Young</u>, 235 B.R. 666 (Bankr.M.D.Fla.1999)). Because it is difficult to establish a transferor's actual intent, courts generally consider the totality of the circumstances and determine whether any "badges of fraud" are present in connection with a particular transfer. <u>PSI Industries</u>, 306 B.R. at 387 (<u>citing</u> <u>In re World Vision Entertainment, Inc.</u>, 275 B.R. 641 (Bankr.M.D.Fla.2002)). "[W]hile a single badge of fraud may create only a suspicious circumstance, several of them together may afford a basis to infer fraud." <u>Id.</u> The Eleventh Circuit has adopted the badges of fraud contained in Florida Statute Section 726.105(2) for consideration by courts in determining a debtor's actual intent regarding a transfer. <u>In re McCarn's Allstate Finance, Inc.</u>, 326 B.R. 843, 849-850 (Bankr.M.D.Fla.2005) (<u>citing</u> <u>In re Levine</u>, 134 F.3d 1046, 1053 (11th Cir.1998)). The badges of fraud supplied by Florida Statute Section 726.105(2) are listed as follows:

(a)    The transfer or obligation was to an insider.

(b)    The debtor retained possession or control of the property transferred after the transfer.

(c)    The transfer or obligation was disclosed or concealed.

(d)    Before the transfer was made or obligation was incurred, the debtor had been sued or threatened with suit.

(e)    The transfer was of substantially all the debtor's assets.

(f)    The debtor absconded.

(g)    The debtor removed or concealed assets.

(h)    The value of the consideration received by the debtor was reasonably equivalent to the value of the asset transferred or the amount of the obligation incurred.

(i)    The debtor was insolvent or became insolvent shortly after the transfer was made or the obligation was incurred.

(j)    The transfer occurred shortly before or shortly after a substantial debt was incurred.

In this case, the plaintiff has demonstrated actual fraud in the transfer of the Observatory Home to the debtor's wife. The totality of the circumstances clearly shows that the debtor intended to place his interest in the Observatory Home outside of the reach of his creditors when he and his wife executed and recorded the deed removing his name from the property on June 9, 2003.  The transfer was made at the insistence of the defendant specifically so that she would not forfeit the asset in order to pay the debtor's bills.  At the time of this transfer, the debtor had multiple creditors, one of whom obtained a judgment against him for $180,140.66 on the very same day of the transfer. Moreover, the debtor received <u>no</u> consideration in exchange for his interest in the Observatory Home to an obvious insider—his wife. The debtor conceded he was insolvent and also was not paying his bills at the time of the transfer. Accordingly, the evidence is sufficient to show that the transfer was fraudulent under Florida law and subject to avoidance by the trustee under Florida Statute 726.105(a).[4]

The defendant argues, however, that she and the debtor owned the Observatory Home as tenants by the entireties and that, therefore, the full value of the home would be fully exempt

---

[4] The transfer is also subject to avoidance because it was constructively fraudulent under Florida Statute 726.105(b).  The debtor, who received <u>no</u> consideration for relinquishing his 50 percent interest in the Observatory Home, certainly failed to receive "a reasonably equivalent value" for the property at a time when he was financially insolvent.

from the claims of creditors and the trustee.  If so, the trustee is unable to prove a key element—that the debtor's creditors could have sold the Observatory Home to pay the debtor's debts due to them.  Under Florida law, it is true that property owned by a debtor as tenancy by the entireties with a non-debtor spouse cannot be reached by creditors of only one of the spouses. Musolino v. Sinnreich (In re Sinnreich), 391 F.3d 1295, 1297 (11th Cir. 2004). The defendant's argument fails, however, because the debtor and the defendant did not own the Observatory Home as tenants by the entireties.

The nature of a debtor's interest in property is determined by state law. Sinnreich, 391 F.3d at 1297 (citing Butner v. United States, 440 U.S. 48, 55, 99 S.Ct. 914, 59 L.Ed. 2d 136 (1979)). In Florida, "[p]roperty held as a tenancy by the entireties possesses six characteristics: (1) unity of possession (joint ownership and control); (2) unity of interest (the interests in the account must be identical); (3) unity of title (the interests must have originated in the same instrument); (4) unity of time (the interests must have commenced simultaneously); (5) survivorship; and (6) unity of marriage (the parties must be married at the time the property became titled in their joint names)." Beal Bank, SSB v. Almand and Associates, 780 So.2d 45, 52 (Fla. 2001) (citations and footnotes omitted).

Property held by a married couple as tenants by the entireties belongs to neither spouse individually; rather each spouse is seized of the entire property. Sinnreich, 391 F.3d at 1297; Beal Bank, 780 So.2d at 53. "[W]hen property is held as a tenancy by the entireties, only the creditors of both the husband and wife, jointly, may attach the tenancy by the entireties property; the property is not divisible on behalf of one spouse alone, and therefore it cannot be reached to satisfy the obligation of only one spouse." 391 F.3d at 1297 (quoting 780 So.2d at 53). Therefore, in cases such as this where only one spouse incurs debts or where spouses incur debts separately, ownership of property as tenants by the entirety prevents creditors from reaching the

debtor's assets. Here, no joint debts exist that would allow the trustee to administer property owned by the debtor and his non-filing spouse as tenants by the entireties.

The problem for the debtor and the defendant in this case is that they were not married when they took title to the Observatory Home on May 22, 1998. "A tenancy by the entireties can be created only when the grantees stand in relationship of husband and wife at the time of the conveyance to them, and absent such a relationship, an attempt to create such tenancy must fail." Young v. Young, 37 Md. App. 211, 216, 376 A.2d 1151, 1155 (Md. App. 1977) (citing Lopez v. Lopez, 250 Md. 491, 510, 243 A.2d 588 (1968) (other citations omitted)); See also Reinhardt v. Diedricks, 439 So.2d 936, 937 (Fla. App. 3 Dist.1983) (Since couple was not husband and wife as a matter of law, their taking title to property as such could not create an estate by the entirety with right of survivorship, only an estate in common); Cavanagh v. Cavanagh,  468 A.2d 286, 288 (R.I.1983) (Tenancy by the entirety requires the existence of a valid marital relationship at the time of conveyance). Moreover, a subsequent marriage of the grantees of real property does not convert retroactively their ownership into a tenancy by the entireties. Young v. Young, 37 Md. App. 211, 216, 376 A.2d 1151, 1155 (Md. App. 1977) (citing Schwarz v. United States, 191 F.2d 618, 621 (4th Cir. 1951) (Observing the "well settled" principle "that the marriage of persons holding an estate as joint tenants or tenants in common does not convert such an estate into one by the entireties.") (citing 1 Tiffany Real Property 2d ed. 646; 2 Coke on Littleton sec. 187(b); Fulper v. Fulper, 54 N.J.Eq. 431, 433, 34 A. 1063, 32 L.R.A. 701)). Therefore, because the unity of marriage was not present when the debtor and her husband received the deed to the Observatory Home, the tenancy by the entireties exemption fails.

The fact that a Corrective Deed later was issued and recorded on June 19, 1998, subsequent to the debtor's marriage to the defendant, likewise affords no tenancy by the entireties protection for the Observatory Home. A "deed takes effect from the date of delivery" and recording is "not essential to its validity as between the parties or those taking with notice."

<u>Sweat v. Yates</u>, 463 So.2d 306, 307 (Fla. App. 1 Dist. 1984). Moreover, corrective deeds do not convey title, rather, they merely reform the original instrument conveying title in order to rectify a mistake, and relate back to the date of the original instrument. "The theory of reformation on grounds of mistake is to reform the agreement to reflect what the parties would have agreed to had there been no mistake." <u>Kartzmark v. Kartzmark</u>, 709 So.2d 583, 585 (Fla. App. 4 Dist.1998) (<u>citing</u> <u>Mills v. Mills</u>, 339 So.2d 681, 684 (Fla. 1st DCA 1976)). "A reformation relates back to the time the instrument was originally executed and simply corrects the document's language to read as it should have read all along." <u>Kartzmark</u>, 709 So.2d at 585 (<u>quoting</u> <u>Providence Square Ass'n v. Biancardi</u>, 507 So.2d 1366, 1371 (Fla. 1987)); <u>Porter v. Meigs</u>, 74 So.2d 82, 85 (Fla.1954). In this case, the 1998 Revised Recorded Deed (Plaintiff's Exh. No. 1) altered the original deed in order to fix the error in the legal description of the conveyance deed executed previously on May 22, 1998.  The revised deed included all of Lot 28, not just the north one-half.

The same exact mistake occurred a second time when the debtor conveyed his interest to his wife on June 9, 2003.  The Quit Claim Deed, as executed, only conveyed a portion of Lot 28. (Plaintiff's Ex. No. 4).  The problem was not fixed until the Corrective Deed was executed by the debtor on July 25, 2005.  (Plaintiff's Ex. No. 7).  As ruled earlier, the Court would find this later Corrective Deed related back in time to the original transfer, June 9, 2003.  For similar reasons, the Court holds that the debtor and defendant were not married when they obtained title to the Observatory Home, and the later recording of the 1998 Revised Recorded Deed to correct the error in the legal description did not convert the ownership to the status of tenancy by the entireties.

In summary, the Court finds that the Debtor had a 50 percent interest in the Observatory Home when he fraudulently transferred his interest in the property to the defendant on June 9, 2003. However, the Court has no specific valuation of the property, or the value of the debtor's

half interest in the property, on that date. The initial purchase price was $77,000. The home later sold, on July 25, 2005, for $190,000. After paying the costs associated with the sale and reimbursing the defendant's sister for her contributions to the improvements made to the Observatory Home, all of which the Court finds appropriate, the defendant received net proceeds of approximately $75,000. The debtor would have been entitled to receive one-half of this amount, $37,500.

Because the trustee has demonstrated that the debtor's transfer of his interest in the Observatory Home to the defendant on June 9, 2003, was actually and constructively fraudulent under Florida Statute Section 726.105, he is entitled to recover the value of the debtor's interest in the home, $37,500, from the defendant. A separate judgment consistent with this Memorandum Opinion shall be entered.

DONE AND ORDERED in Orlando, Florida, on the 21st day of December, 2006.

KAREN S. JENNEMANN
United States Bankruptcy Judge

Copies provided to:

Debtor:  Thakurdial R. Ramsurat, 7826 Killary Court, Orlando, FL  32835

Debtor's Attorney:  Mario A. Marcia, 400 N. Ferncreek Avenue, Orlando, FL  32803

Plaintiff:  Kenneth D. Herron, Jr., Trustee, 1851 W. Colonial Drive, Orlando, FL  32804

Plaintiff's Attorney:  Jeanne A. Kraft, 1851 West Colonial Drive, Orlando, FL  32804

Defendant:  Bhoopmanie Singh, 7826 Killary Court, Orlando, FL  32835

Defendant's Attorney:  Mario A. Garcia, 400 N. Ferncreek Avenue, Orlando, FL  32803